UNITED STATES, Appellee

v

ERIC WILSON, Specialist Five,
U. S. Army, Appellant

18 USCMA 400, 40 CMR 112

No. 21,302

June 27, 1969

*Kirk Y. Griffin, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Edward J. Bellen, Esquire, Major John Wall Hanft,* and *Captain Douglas J. Wold.*

*Captain Salvatore A. Romano* argued the cause for Appellee, United

States. With him on the brief were *Lieutenant Colonel David Rarick, Major Edwin P. Wasinger,* and *Captain Gregory U. Evans.*

## Opinion of the Court

DARDEN, Judge:

The appellant was tried by a general court-martial in May 1967 for the premeditated murder of his wife. Because the appellant stood mute before the court, the law officer, as required by Article 45, Uniform Code of Military Justice, 10 USC § 845, entered a plea of not guilty in his behalf. The court found the appellant not guilty of premeditated murder but guilty of the lesser offense of unpremeditated murder. The sentence was dishonorable discharge, total forfeitures, confinement at hard labor for twenty-five years, and reduction to the lowest enlisted grade. Because of errors not material here, intermediate appellate authorities reduced the confinement at hard labor to three years. This Court granted review on two issues, the first of which is:

Whether the law officer substantially prejudiced the accused by permitting a Government psychiatrist to testify about the mental responsibility of the accused on the night of the alleged offense?

The asserted error here is founded on the risk that the conclusions of the psychiatrist were based at least in part on interviews with the accused.

After the Article 32 investigation in this case, the Government took the appellant to an Army hospital in Germany for psychiatric evaluation. Appellant's counsel strongly objected to this procedure and he advised his client not to cooperate in the examination. In compliance with Article 31, Code, supra, 10 USC § 831, the hospital officials informed the appellant that he could refuse to answer any questions that might tend to incriminate him and that any statements he made might be used against him. They did not inform him that he could have legal counsel present at the examination. As a result of this warning or his counsel's advice, or both, the appellant refused to have x-rays, he refused psychological testing, he refused parts of his physical examination, and he stopped the questioning at various points in the examination. He gave no information about the alleged offense or his relationship with his wife. Apparently, the interviews consisted wholly of subjects such as his background, his work, and current events. After considering these interviews, the appellant's records, and the Article 32 investigation file, a three-man medical board concluded the appellant was fit to stand trial and that at the time of the offense he was legally sane.

At the trial, two prominent German psychiatrists testified for the defense. They agreed that appellant's wife was the source of a series of provocations that culminated in a psychiatric explosion on the date of the offense. They testified that the accused lost complete control of his will and experienced a total inability to adhere to the right and control his impulses although at the time he knew right from wrong and the nature of his act. They disagreed about the pathological cause. One termed it a derangement but the other would not go so far.

The Government called the senior member of the medical board, referred to above, as an expert witness in rebuttal. This witness had been instructed that he should not mention the appellant's exercise of his right to remain silent. In dispute is the question whether this witness was instructed that he could use his interviews with the appellant as part of the basis for his conclusions about appellant's mental condition. When this psychiatrist, Lieutenant Colonel Hudson, was asked in an out-of-court hearing whether he could give an opinion about the appellant's mental responsibility without considering the interviews, he stated that he could but that to separate the effect of the interviews would be difficult. In court, he was asked for an opinion based solely on the health and files of the appellant

and the statements of witnesses. In addition, he gave an opinion based on a reading of the transcript of the appellant's testimony and the testimony of the psychiatrists retained by the appellant. The law officer did instruct the Government psychiatrist not to mention what the appellant said during the interviews or even that he had interviewed him. He testified that he found the appellant to be legally sane at all times. On cross-examination, the defense brought out that there had been no discussion with the appellant of the alleged offense or the relationship between the appellant and his wife.

Before this Court, counsel for the appellant urge that Lieutenant Colonel Hudson and the other doctors who interviewed the accused had a duty to warn him of his right to counsel and to have counsel present during these interviews, citing Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966), and United States v Tempia, 16 USCMA 629, 37 CMR 249. They assert that an interview with the accused by the Government psychiatrist at the hospital was "custodial interrogation" and that the presence of counsel at such interrogations is a necessary protective device to make the process conform to the requirements of the privilege against self-incrimination under the Fifth Amendment.

In response, the Government asserts that a medical examination of an accused by qualified doctors in a modern hospital, even if this examination may later serve as the basis for an expert opinion as to the legal sanity of the accused at the time of the offense with which he is charged, is not the " 'incommunicado interrogation of individuals in a police-dominated atmosphere' or the 'custodial police interrogation' envisioned by the United States Supreme Court in *Miranda* v *Arizona*." This argument continues that *Miranda* was an attempt to correct certain " 'police practices,' " and that there is nothing in the decision to indicate that the Supreme Court also felt that members of the medical profession were guilty of practicing the " 'third degree' and 'interrogation techniques.' "

This Court recently decided in United States v Babbidge, 18 USCMA 327, 40 CMR 39, that an accused who was required to submit to psychiatric evaluation by the Government as a condition precedent to his presenting psychiatric testimony that would raise an issue as to his mental responsibility had not been denied the protection of Article 31. In *Babbidge,* as here, the Government psychiatrist testified only to his conclusions about the sanity of the accused and not to any statements the accused made to him. We held that when the accused opened his mind to a psychiatrist in an attempt to prove temporary insanity, his mind was opened for a sanity examination by the Government and that his action constituted a qualified waiver of his right to silence under Article 31. We rejected the argument that the conclusions of the Government psychiatrist were incriminating or that they were a " 'link in the chain of evidence used against . . . [the accused].' " *Id.,* at page 333.

Our decision in *Babbidge* was heavily influenced by reasoning of the United States Court of Appeals for the Fourth Circuit in United States v Albright, 388 F 2d 719 (1968). The facts in *Albright* correspond almost completely with those in the instant case. There, the court held that since the Government had the burden of proof on the issue of mental responsibility, the "maintenance of a 'fair state-individual balance' clearly required that the government be permitted to have defendant examined." *Id.,* at page 724. The court continued:

"Lastly, we comment that the purpose and result of the examination is not 'the cruel, simple expedient of compelling it (incriminating evidence) from his own mouth.' To repeat an earlier statement, the purpose of the examination is not to determine whether a defendant did or did not do the criminal acts charged, but whether he possessed the requisite mental capacity to be criminally responsible therefor, if

other proof establishes that he did do them. So limited, we find nothing in the examination, over a defendant's objection, to violate a defendant's privilege against self-incrimination." [*Id.*, at page 725.]

In *Albright*, the court also rejected an argument that the appellant's right to counsel had been abridged with these words:

"State v Whitlow, supra, holds that a defendant has no federal or state constitutional right to have his attorney present during a psychiatric examination conducted at the instance of the prosecutor. In this conclusion we agree. From the intimate and personal nature of the examination, we are satisfied that, except in the unusual case, the presence of a third party, in a legal and non-medical capacity, would severely limit the efficacy of the examination, and that if defendant's privilege against self-incrimination is given full effect with regard to his inculpatory statements to his examiner, the need for the presence of an attorney is obviated. We find no error in the failure to permit defendant's counsel to be present during his examination by Dr. Rossman." [*Id.*, at pages 726–727.]

The opinion of this Court in United States v Babbidge, supra, refers to other decisions by courts established under Article III of the Constitution in cases where a defendant who invoked the defense of insanity refused to submit to a mental examination by the Government when the Government had the burden of proof. Those decisions referred to such a result as "a strange situation, indeed," "a travesty on justice," "an absurdity," and as "violat-[ing] judicial common sense." Pope v United States, 372 F 2d 710, 720 (CA 8th Cir) (1967), reversed on other grounds, 392 US 651, 20 L Ed 2d 1317, 88 S Ct 2145 (1968); see also 397 F 2d 812 (CA 8th Cir) (1968); Battle v Cameron, 260 F Supp 804, 806 (DC DC) (1966); Alexander v United States, 380 F 2d 33, 39 (CA 8th Cir) (1967).

In Thornton v Corcoran, 407 F 2d 695, 702 (CA DC Cir) (1969), the court declined to resolve the question of whether presence of counsel at a psychiatric examination was constitutionally required and commented:

"Even could we conclude the petitioner is constitutionally entitled to further protection of his rights at the staff conference, we cannot be certain that the presence of counsel is the appropriate remedy."

Appellate defense counsel insist that even the conclusions based in part on interviews with the accused are inadmissible because to permit the use of the product of the accused's statement would be to permit the Government to do indirectly what it is forbidden to do directly. The underpinning of appellant's contention here is the "fruit of the poisonous tree" doctrine. Among the cases cited in the attempt to sustain this position are Nardone v United States, 308 US 338, 340, 84 L Ed 307, 60 S Ct 266 (1939), where a derivative use of unauthorized telephone interceptions was prohibited as being in conflict with a Congressional policy that made use of such interceptions " 'inconsistent with ethical standards and destructive of personal liberty' "; Silverthorne Lumber Co. v United States, 251 US 385, 64 L Ed 319, 40 S Ct 182 (1920), which held that the Government could not use information secured during an unlawful search to subpoena the same documents that had been unlawfully discovered; and Wong Sun v United States, 371 US 471, 9 L Ed 2d 441, 83 S Ct 407 (1963), a decision that evidence seized during an unlawful search cannot constitute proof against the victim of the search and that the exclusionary prohibition extends to indirect as well as to the direct products of such invasions.

The fallacy of the "fruit of the poisonous tree" reasoning in this case is that it misconceives, in our opinion, the nature of the tree. The metaphor can be applied only if one equates professional psychiatric examination in a Government hospital with breaking down doors, surreptitiously tapping telephones, or forcing the way into the bedroom of an accused. We reject the contention that the examination

**403**

was unconstitutional, unlawful, or improper. Consequently, we must hold that conclusions based on such an examination are untainted.

The privilege against self-incrimination is required to be interpreted liberally under Miranda v Arizona, supra. In that case, the court quoted from Counselman v Hitchcock, 142 US 547, 562, 35 L Ed 1110, 12 S Ct 195 (1892), that the privilege is as " 'broad as the mischief against which it seeks to guard.' " (384 US 436, 459–460.) *Counselman* also defined the object of the Fifth Amendment as being "to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had *committed a crime*." (Emphasis supplied.) Conclusions of the Government psychiatrist tended to prove not whether Wilson committed the crime but whether he should be held responsible for it.

The second issue is:

Whether the law officer erred in his instruction on expert opinion testimony?

The following quotation is from the first part of the instructions on expert opinion testimony:

"You have heard the testimony of Professor Doctor Rauch and Professor Doctor Schaltenbrand, and Lieutenant Colonel Hudson, Medical Corps, US Army, all of whom testified as to the sanity of the accused in this case. You also heard the testimony of Captain Mooney, US Army, Medical Corps, and Major Kalivoda of the United States Army Medical Corps, who testified as to the treatment of the accused for self-inflicted wounds after the alleged incident and as to the cause of death of Shirley Ann Wilson, respectively. These witnesses are known in law as expert witnesses, because they are more qualified in the field of psychiatry and medicine than ordinary men.

"You are advised that you, as members of the court, are not bound to accept the opinion of these witnesses as to the truth of the fact in issue. Their testimony is to be considered by you the same as that of other witnesses. In considering the testimony of these experts, you have full power to consider their qualifications, the actual experience, if any, which they have had, including experience in the case, and just as far as their testimony appeals to your judgment, convincing you of its truth, you should adopt it, but the mere fact that witnesses are called as experts and give opinions upon a particular point does not necessarily obligate you to accept those opinions. *Weight or credence should not be given to the opinion of experts insofar as it clashes with common knowledge and ordinary observations.*" [Emphasis supplied.]

After testimony of the expert witnesses on the sanity issue, the law officer concluded by stating:

"I remind you that the testimony of lay witnesses should not be ignored as to the sanity of the accused merely because expert estimony [sic] has been introduced. You will recall that the defense introduced the testimony of several witnesses who knew the accused over a considerable period of time, and who related to you the conduct of the accused as to the time preceding the alleged homicide. The testimony of these witnesses is admissible and should be considered by you on the issue of sanity. In this regard, you should also take into consideration your own evaluation of the accused's testimony, and his conduct and appearance, here before you in open court. These lay witnesses also testified as to the accused's conduct immediately following the alleged homicide."

Counsel for the appellant believe the instruction that "Weight or credence should not be given to the opinion of experts insofar as it clashes with common knowledge and ordinary observations" was prejudicially erroneous to the appellant because it approaches a comment on the weight of the evidence. Their argument is that the basic purpose in introducing psy-

chiatric testimony is to assist men of "common knowledge and ordinary observations" in determining the mental responsibility of the accused. They apprehend that the instruction complained of caused the court to give undue weight to lay testimony and that it constituted a substantial restriction on the exclusive right of the members of the court-martial to judge the testimony of the expert witnesses.

The Government replies that the instructions conveyed nothing more than that the opinion of expert witnesses is not binding on a jury. Moreover, they insist that expert testimony is not binding just because it is furnished by an expert but that it must be assessed by the triers of fact to evaluate its credibility and weight.

The opinion of an expert witness cannot be arbitrarily ignored. United States v Carey, 11 USCMA 443, 29 CMR 259. But expert testimony is not binding upon a jury merely because it is expert testimony. Credibility and weight to be given to the expert testimony are jury issues. Mims v United States, 375 F 2d 135 (CA 5th Cir) (1967).

In isolation, the sentence complained of gives an erroneous impression. But when it is considered with other instructions and rulings, this instruction is unlikely to have prejudicially influenced the deliberations of the court.

As the concluding instruction, quoted supra, indicates, the law officer reminded the court that the testimony of lay witnesses should not be ignored as to the sanity of the accused merely because expert testimony had been introduced. He also reminded that the defense had introduced the testimony of several witnesses who had known the accused over a considerable period of time and who had testified about the conduct of the accused at the time preceding the alleged offense. "In weighing evidence, a member is expected to utilize his common sense and his knowledge of human nature and of the ways of the world." United States v Oakley, 11 USCMA 187, 191, 29 CMR 3.

Although the instruction could have been phrased much more felicitously, we believe that as a whole the instruction conveys the thought that the fact finders were not bound to accept the opinions of expert witnesses solely because they emanated from experts but that they were to evaluate these opinions within the context of their common knowledge and observation. The court was not required to accept completely the opinions of experts when the expert conclusions clashed with common knowledge and ordinary observations. On the other hand, the court was not required to subordinate the opinion of expert witnesses to the testimony of the lay witnesses. Therefore, we find no merit in this issue.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in the result):

I concur in the result.

This Court has now decided that when an accused raises the issue of insanity and offers evidence thereon by expert witnesses, he waives his right to silence guaranteed by the Fifth Amendment to the Constitution. The only alternative open to him, as my brothers held in United States v Babbidge, 18 USCMA 327, 40 CMR 39, is to forgo his right to this defense. I dissented in Babbidge and need not restate my views. Suffice to say, this has now become the law of the Court and I have no alternative but to concur in the result in this case.