UNITED STATES, Appellee

v

RONALD E. ROSS, Corporal, U. S. Marine Corps, Appellant

19 USCMA 51, 41 CMR 51

*Joseph F. Dyer, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Allen D. Black,* JAGC, USNR, and *Lieutenant Stephen W. Grafman,* JAGC, USNR.

*Colonel C. R. Larouche,* USMC, argued the cause for Appellee, United States. With him on the brief was *Captain Lester G. Fant, III,* USMCR

## Opinion of the Court

DARDEN, Judge:

This case is another involving the circumstances in which an accused may be subjected to physchiatric or psychological testing without his having been warned of his rights relating to self-incrimination and to counsel.

Before a general court-martial convened at Camp Lejeune, North Carolina, Corporal Ross pleaded not guilty to the charged offenses of desertion, premeditated murder, and larceny, in violation of Articles 85, 118, and 121, Uniform Code of Military Justice, 10 USC §§ 885, 918, and 921. The court found him guilty of the lesser included offenses of unauthorized absence, unpremeditated murder, and wrongful appropriation, in violation of Articles 86, 118, and 121, Code, supra, 10 USC §§ 886, 918, and 921. After action by intermediate appellate authorities, his sentence stands as confinement at hard labor for twenty-five years, forfeiture of all pay and allowances, reduction to the lowest pay grade, and a dishonorable discharge. The Judge Advocate General of the Navy certified to this Court under Article 67(b)(2), Code, supra, 10 USC § 867, an issue of whether the law officer erred in admitting the testimony of two Navy psychiatrists whose testimony was based in part on a psychological test that was given to Corporal Ross without his being warned about his rights relating to self-incrimination and to counsel.

According to an extrajudicial statement of the accused, the voluntariness and the admissibility of which he contested strongly both at trial and again on review, Corporal Ross killed Mrs. Vera Nichols, the wife of a Marine then in Vietnam and a woman with whom he had been romantically involved for some time, after a tryst at her home. He stabbed her after an argument. Before leaving the house, he attended the baby of Mrs. Nichols when she began to cry in an adjoining room. He then attempted suicide by blowing out the pilot light on the gas stove and turning on all the gas burners. Changing his mind, he decided he would visit his mother and left in Mrs. Nichols's automobile, which he drove to the point of his arrest in Detroit.

At the trial, the defense was based largely on the alleged insanity of the accused at the time of the commission of the offenses in question. In an attempt to support this contention, the defense first called two lay witnesses—the mother of the accused and a staff member of the stockade where Ross was first confined. Two expert witnesses, both of whom were affiliated with the University of North Carolina, then testified. Their testimony made no attempt to conceal that the accused had killed Mrs. Nichols. In fact, their testimony conceded that he had done so.

In rebuttal, the Government called several witnesses including the Commanding Officer and the senior enlisted member of Corporal Ross's unit, a medical officer who had treated him for an ulcer, one of the investigating agents who apprehended him in Detroit, the medical officer at the brig, Dr. Carl S. Wellish, a staff member of the Neuro-

psychiatric Department at the Naval Hospital, Camp Lejeune, and Dr. John F. McGrail, Chief of the Neuropsychiatric Department at the Naval Hospital, Camp Lejeune.

When Dr. Wellish was called as a witness, trial defense counsel objected to any of his testimony that would be based upon information derived from the accused "in derrogation [sic] of his rights under Article 31 of the Code." An out-of-court hearing then developed the following information about the testimony in question: After preferral of charges against the accused, the convening authority requested the Commanding Officer of the Naval Hospital at Camp Lejeune to convene a formal medical board to inquire into the sanity of the accused. Dr. Wellish, the senior member of the board, directed that a series of psychological tests be administered to the accused to assist the board in its findings.

On October 13, 1967, Ross was taken to the Naval Hospital for the administration of the psychological tests that were to be part of an evaluation of his sanity. His defense counsel was not notified that the tests would be given and no Article 31 or equivalent warning was given the accused. Dr. Wellish testified that the purpose of the tests was to learn the ability of the accused to answer questions revelantly and coherently; his orientation as to the day, date, and month of the year; his general intelligence level; and whether or not there was any indication of organic brain damage.

Before ruling, the law officer engaged with Dr. Wellish in the exchange quoted below:

"LO: Now this brings me back to the test itself. Were there any questions asked relating to the offenses, anything from which any incriminatory evidence was obtained?

"A. Indirectly.

"TC: Would you please explain that answer?

"A. Well the sentence completion test is kind of an open ended test, and a psychologist is much more qualified than I am to give you the details of it, but if a question is asked such as: A house reminds you of, and you fill in the blank. Well indirectly you can deduce possible data relating to almost anything on that type of a test.

"LO: That's all interpretation?

"A. That's the interpretation that is correct.

"LO: But no questions relating directly relating to any offense of which he is charged?

"A. Absolutely not, except in the indirect manner I have indicated.

"TC: If it will assist in your decision Mr. Law Officer, I will get a copy of the tests.

"LO: Very well."

The law officer overruled the defense counsel's objection and admitted the testimony of Dr. Wellish. No admissions were elicited by the tests, and none of Ross's answers were revealed to the court.

On October 16, 1967, Ross appeared before the medical board with both of his defense counsel for a period of about ten minutes. He refused to talk to the board beyond giving his name, age, date of birth, and place of birth. In open court, Dr. Wellish made no reference to the test results or to the tests as a basis of his testimony.

In setting out the basis of his testimony, Dr. McGrail did not mention the psychological tests. In response to a question by the law officer, however, Dr. McGrail did indicate that he had "reviewed the psychological tests."

In United States v Babbidge, 18 USCMA 327, 40 CMR 39, a case in which, as here, the Government expert testified only to his conclusions about the sanity of the accused and not to any statements the accused made to him, a majority of this Court held that the accused had not been denied the protection of Article 31. In the absence of any showing that anything the accused may have said to the psychiatrists tended to prove the accused com-

**53**

mitted an offense, we rejected the argument that since the questioning of the accused may have contributed to the conclusions of the Government psychiatrists, this was a link in the chain of evidence against the accused. In so holding, the majority opinion quoted the opinion of the Court of Appeals in United States v Albright, 388 F2d 719, 725 (CA4th Cir) (1968), to the effect that " 'the purpose of the examination is not to determine whether a defendant did or did not do the criminal acts charged, but whether he possessed the requisite mental capacity to be criminally responsible therefor, if other proof establishes that he did do them.' " United States v Babbidge, supra, at page 331.

The accused in United States v Wilson, 18 USCMA 400, 40 CMR 112, received an Article 31 warning but was not informed that he could have legal counsel present at the psychiatric examination. The law officer instructed the Government psychiatrist not to mention what the accused said during the interviews or even that he had interviewed him. This Court concluded in *Wilson* that the psychiatric examination, without his legal counsel being present, did not violate his constitutional rights.

In *Babbidge* and *Wilson,* the Government psychiatrist testified only to his conclusions about the sanity of the accused and not to any statements the accused made to him. In both of those cases, we were unimpressed by suggestions that even the conclusions based in part upon interviews with the accused were inadmissible, because to permit the use of the product of the accused's statement would be to approve the Government's doing indirectly what it is forbidden to do directly. We thought that the cases supporting this doctrine did not provide the decision in our cases because we distinguished professional psychiatric examination in a Government hospital from breaking down doors, tapping telephones, and forcing one's way into the bedroom of an accused. *Babbidge* and *Wilson* govern our decision here.

The significant determinant is that the psychiatric examinations ■ tended to prove not the commission of a crime but whether the accused should be held responsible for it.

The appellate defense counsel argue further that since Ross's counsel was not notified before he was sent to the hospital for psychological testing, this action violated the provisions of the Manual for Courts-Martial, United States, 1951, and the Canons of Professional Ethics of the American Bar Association that any dealings with an accused should be through his counsel. They assert that here not only was there no attempt to deal with the accused through his counsel but that it appears as though Government counsel took deliberate pains to avoid informing defense counsel such testing was even contemplated.

Although the record of trial shows that the assistant trial counsel was at the Naval Hospital at the time the tests were administered, it also shows that he was conferring with the medical board and not with the psychologist who administered the test. The following excerpt from Dr. Wellish's testimony shows that it was he who ordered the psychological evaluation as a part of his responsibility and not the trial counsel or assistant trial counsel.

"WIT: I can clarify that, Mr. Law Officer. I am the Senior Member of the Board. When the accused . . . when the appointing order was received and the Board was convened, there were three questions we were specifically asked to go into. First was whether or not the accused was able to distinguish right from wrong; the second was his ability to adhere to the right; and the third was his ability to stand trial at the present time. In view of those factors, I suggested, in fact, I ordered that the psychological evaluation be given, but I refused to see the accused until his attorneys had been informed and could be present. Now the reasons that I did that was just for the third point that I mentioned.

Since this Board was set up, we had to have some valid way of determining the man's orientation, his intelligence, and his relevance and coherence, at least at the time we were examining him. I also was interested in the question of organic brain disease. Therefore, I ordered that these tests be given, and the accused was brought to the hospital. He was given the tests, but no questions were asked until his counsel was present. I myself do not read these tests; I do not know what's in the tests. I merely ask the psychologist who administered the test the four questions I was interested in: orientation, relevancy and coherence, intelligence and organic brain damage."

In a situation such as that now before us, we think the defense counsel should have been notified ■■■■■■■ ■ that the psychological testing would take place as a preliminary to the appearance before the medical board. In our view, though, the failure to notify the defense counsel does not result in prejudicial error. A determination of whether the failure to notify defense counsel violated the Canons of Professional Ethics of the American Bar Association is a separate question from whether any such failure prejudiced the accused.

The last contention by appellate defense counsel is that Doctors Wellish and McGrail had inadequate bases upon which to predicate their ostensive expert testimony. To support this position, they cite statements that the value of a psychiatrist's testimony depends largely upon his opportunities for observation and they emphasize the brief period during which the Navy psychiatrists really observed the accused. Although they state that Doctors Wellish and McGrail had the power to order Corporal Ross to their ward for a period of observation and evaluation, it appears that such action would have

been nothing more than extended physical observation, without the diagnostic benefits of any kind of meaningful discussion with Ross, because he had invoked his privilege of silence. We are asked to discount or disqualify their testimony because they contend it is tendentious and because it is qualified by being limited to "the information available to me."

It seems obvious that prolonged and intimate interviews are the most satisfactory basis for a psychiatric opinion. In this case, however, we are satisfied that the testimony met the requirements prescribed by paragraph 138e, Manual for Courts-Martial, United States, 1951. Cf. United States v Heilman, 12 USCMA 648, 31 CMR 234; United States v Walker, 12 USCMA 658, 31 CMR 244. The brevity of the observation of the accused by the Navy psychiatrists affects the weight, not the admissibility, of their testimony.

The certified question is answered in the negative.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in the result):

I concur in the result.

In United States v Babbidge, 18 USCMA 327, 40 CMR 39, my brothers held that when an accused raises the issue of insanity and offers evidence thereon, he waives his right to silence guaranteed by the Fifth Amendment to the Constitution. The only alternative open to him in such a situation is to forgo his right to this defense. I dissented in Babbidge and need not restate my views. In the case at bar, they have extended this ruling to include the psychological testing preceding the intended psychiatric examination,[1] despite the fact that his attorney was not informed that the tests were to be administered and no Article 31 or

---

[1] When the accused appeared before the medical board with his attorney, he declined to talk to the board beyond giving his name, age, date and place of birth.

equivalant warning was given prior to the administration of the tests. The basis for this holding is that no admissions concerning the charged offenses were elicited by the tests and none of the accused's answers were revealed to the court.

In my opinion, the failure to give an Article 31 warning prior to the psychological testing was a patent violation of the Uniform Code of Military Justice. It matters not that the evidence obtained thereby did not tend to prove that the accused committed an offense. Any *evidence* obtained in violation of the privilege against self-incrimination is inadmissible (United States v Price, 7 USCMA 590, 23 CMR 54; Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966); United States v Tempia, 16 USCMA 629, 37 CMR 249), including evidence used in rebuttal to a defense of insanity. Cf. United States v Lincoln, 17 USCMA 330, 38 CMR 128.

I believe that prejudicial error is apparent. However, since the holding of the majority has now become the law of the Court, I have no alternative but to concur in the result in this case.