UNITED STATES

v.

**David M. DAY, Boilerman Second Class, U.S. Coast Guard.**

**CGCMS 9938**
**Docket No. 765.**

U.S. Coast Guard Court of Military Review.

20 Nov. 1975.

Appearances: Military Judge: CAPT Richard M. Thomas, USCG. Trial Counsel: LT Tyree B. Harris IV, USCGR. Assistant Trial Counsel: LT Stephen E. Hart, USCGR. Defense Counsel: LT Gerald A. McGill, USCG. Assistant Defense Counsel: LT Edward H. Bonekemper III, USCG. Appellate Defense Counsel: LCDR E. H. Bonekemper III, USCG. Appellate Government Counsel: LT G. Alex Weller, USCGR.

## OPINION OF THE COURT

ROSENWASSER, Chief Judge:

David Day, the accused, who is white, shot and killed Charlton W. Little, a black Coastguardsman, when the latter began to dance with a white girl at the Enlisted Men's Club of the Coast Guard Training Center, Cape May, New Jersey, on 13 October 1973. He also shot, but did not kill, Seaman Curtis D. Garner, who had come to the aid of Little. As Day's counsel stated at the trial, "there was no rational basis" for the shootings. Tried by judge alone, Day was found guilty of unpremeditated murder under a charge of premeditated murder. He was also found guilty of aggravated assault against Garner, by shooting him in the abdomen with a pistol, and of simple assault by pointing a pistol at one Newton.

■ The fact that Day did the shootings was established by the uncontradicted testimony of several eyewitnesses, and was not contested. Day's counsel explained on voir dire, that the defense was "temporary insanity". Insanity, of course, is a short-cut word. It does not mean the same thing in the context of a criminal trial that it might mean outside the courtroom. In court-martial law, the defense of insanity has reference to a standard, defined with particularity in the Manual for Courts-Martial, for determining the mental responsibility of an accused—his criminal accountability—for the offenses charged against him.[1] Stated

---

1. Para. 120b MCM 1969, states in part: "A person is not mentally responsible in a criminal sense for an offense unless he was, at the time, so far free from mental defect, disease, or de-

in terms of this standard, David Day's defense was that he was either unable to distinguish right from wrong, or not able to adhere to the right, at the time of the acts charged against him; and that his inability proceeded from some mental defect, disease or derangement, and not from something less than a mental defect, disease or derangement.

Day's trial occupied 24 days. It began on 27 February 1974 and proceeded intermittently until 2 May 1974. On that date the judge sentenced him to confinement at hard labor for 14 years, total forfeitures, reduction to Seaman Recruit and a bad conduct discharge. The convening authority approved. The case first came on for hearing before the Court of Military Review on 5 March 1975. We directed a new review and convening authority action. (50 C.M.R. 122). The case was thereafter reviewed by the staff legal officer of the First Coast Guard District and, on 2 June 1975, the District Commander issued the current action of the convening authority. He reduced the confinement to 13 years and six months, but otherwise approved. (Although the legal officer had recommended that the confinement be reduced to ten years, the District Commander subsequently explained that he did not adopt that recommendation because of the seriousness of the offenses, and that the six months reduction was made only to "give Day credit for the long period he was in confinement before and during the trial".) We heard the case for the second time on 17 September 1975.

The assignments of error before us include two jurisdictional points. The first argues that the Commander, Third Coast Guard District, who convened the court, had no legal power to do·so. The other urges that the court-martial lost jurisdiction because this was a capital case and it was tried by judge alone. We shall discuss these two points before taking up the sanity issue: whether the Government failed to prove beyond a reasonable doubt that the accused was mentally responsible for the offenses of which he stands convicted.

If the District Commander who created this court lacked the power in law to do so, then no one in the Coast Guard waŝ authorized to convene a general court-martial. Yet, it is a matter of record that, on 31 May 1951, when the Uniform Code of Military Justice became effective, the Commandant and each District Commander had been duly empowered as general court-martial convening authorities, pursuant to a designation by the Secretary of the Treasury under Article 22 of the Code (10 U.S.C. § 822).

Appellant's argument is constructed on the circumstance that the Coast Guard was transferred from the Treasury Department to the Department of Transportation on 1 April 1967. Prior to that date, the Secretarial designation of the Commandant and District Commanders as general court-martial convening authorities had never been revoked, cancelled or withdrawn by any authority empowered to do so. On and after that date, the savings provision of the Department of Transportation Act, section 12(a) of Public Law 89–670 (80 Stat. 931) operated to keep it in force. No action of the President or of the Congress or of the Secretary of Transportation withdrew from any District Commander the power given to such officers in 1951 to convene general courts-martial.

 Shortly after the Coast Guard was transferred to the Department of Transpor-

---

rangement as to be able concerning the particular act charged both to distinguish right from wrong and to adhere to the right. The phrase 'mental defect, disease, or derangement' comprehends those irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental, as distinguished from the moral, faculties. To constitute lack of mental responsibility, the impairment must not only be the result of mental defect, disease, or derangement but must also deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the act charged." Para. 120*d* prescribes: "No person shall be brought to trial unless he possesses sufficient mental capacity to understand the nature of the proceedings against him and to conduct or cooperate intelligently in his defense."

tation, the Commandant on 3 May 1967 issued an amendment to the Coast Guard Supplement to the Manual for Courts-Martial. Section 0102 thereof confirmed the continuation in existence of the power possessed by the Commandant and the District Commanders by reciting:

By virtue of the authority contained in Article 22(a)(6) of the Code, the following commanding officers of the Coast Guard have been designated as general court-martial convening authorities:

The Commandant of the Coast Guard. The Commander of any Coast Guard District.

Appellant construes the issuance of this simple statement by the Commandant as having "terminated the prior Treasury Secretarial designations". We do not agree. The Commandant could not, even if he wished to, terminate a Secretarial designation made pursuant to Article 22. Appellant says also that there was no jurisdiction "because the Commander, Third Coast Guard District, has not been designated a general court-martial convening authority by the Secretary of Transportation". Again, we do not agree. A new designation by the Secretary of Transportation was not needed.

The other jurisdictional point asserts that the court-martial lost jurisdiction because the military judge alone tried a capital case.[2]

■ The point is insubstantial for two reasons: first, because on the opening day of the trial, on motion of the defense, the military judge ruled, and it became the law of the case, that the penalty of death could not be adjudged. This occurred before the accused requested that he be tried by judge alone. The second reason is: the judge did not arraign and try the accused until after the convening authority signed an amendment to the convening order referring the case to trial as a noncapital case.

**2.** Article 18 UCMJ, in its last sentence, provides that a general court-martial composed solely of a military judge "shall not have jurisdiction to try any person for any offense for

Having in mind the mandate of Article 118 that a person found guilty of *premeditated* murder "shall suffer death or imprisonment for life as a court-martial may direct", the defense moved for a ruling that the maximum punishment in this case is life imprisonment. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The judge so ruled. When he made his ruling, the trial counsel inquired:

I would ask the court for a ruling as to whether or not, if there is a finding of guilty with regard to the issue of premeditated murder, will Your Honor direct the military jury to return a verdict of life imprisonment?

The judge replied that he would. Clearly then, it was the law of the case, declared on the first day of the trial, that this court-martial could not adjudge the penalty of death; and it is immaterial whether *Furman v. Georgia* compelled that result or not.

Later, on 12 March 1974, a military jury of five members was impaneled; but the accused never faced the jury. On the next trial date, 1 April, the defense presented a written request for trial by judge alone. On 3 April the judge approved the request and only then the court became a general court-martial composed of judge alone. At 1220 hours on 4 April, the convening authority signed the amendment referring the case as noncapital; and it was not until 1335 hours on that day that the accused appeared before the court and was arraigned. In fact, then, he was not tried by judge alone under an unrestrictive referral order.

In any event, the referral order is not of primary significance. Under Article 18 of the Code and paragraph 14 of the Manual, the factor of primary significance in determining whether the case is one which can be tried by the judge alone, is whether the death penalty can be adjudged. The death penalty could not be adjudged in this case; the military judge had jurisdiction throughout the trial.

which the death penalty may be adjudged unless the case has been previously referred to trial as a noncapital case."

■ We turn now to a consideration of whether the evidence proved beyond a reasonable doubt that the accused was mentally responsible ("sane") at the time of his offenses.

The issue of the accused's sanity was not introduced as a concrete issue in the case until the 13th day of the trial. The testimony of an expert witness called by the defense made it an issue. The witness was Dr. Thrasher, a Commander in the Medical Corps, U.S. Navy, and a forensic psychiatrist. He expressed the opinion that David Day had suffered an acute paranoid psychotic reaction at the time of the shootings. In his opinion David Day could distinguish right from wrong at the time, but he was not able to adhere to the right.

Dr. Thrasher's testimony was extensive, covering 147 pages of the record, and included the narration of a detailed psychiatric history of the accused, a description of his development of a "very deep-seated hatred for blacks", and an account the accused had given of the events of 13 October 1973. Dr. Thrasher also commented from the witness stand on a videotape recording of one of the 14 interviews he had had with the accused. The tape showed David Day in the doctor's office talking about matters pertaining to his background, his racial attitudes, and his perception of the events when he was shooting Little and Garner. (The tape was allowed to be shown, despite objection, on the theory that it was solely for the purpose of showing the court the method and technic employed by Dr. Thrasher.)

During cross-examination, Dr. Thrasher declined to say that the accused was not mentally responsible when he brought his gun into the Enlisted Men's club on the fatal night, but reiterated the opinion that he was not sane at the time of the shooting, as the following extract shows:

Q. Doctor was this man able to adhere to the right when he strapped his gun on that night?

A. I didn't examine him for—to obtain information for his ability to adhere to the right at that time. I don't know.

Q. Doctor, when did this thing start that you call his acute paranoid psychotic reaction? Exactly when did that start?

A. I don't know exactly when it started. It started about the time that he observed Little and the girl get up and he went in—he felt this welling up of the anger and the rage. It began approximately about that time, right there.

Q. Well, do you equate his ability to adhere to the right with the starting of that or would it begin earlier or later than that?

A. His ability would begin—his—his ability to adhere or not adhere to the right would begin about that time, in that frame of reference. At that point he was—he was psychotic and out of control of what he was doing.

In rebuttal, the prosecution adduced the testimony of three Army psychiatrists. Each of the three expressed the opinion that the accused was so far free from mental defect, disease or derangement as to be able both to distinguish right from wrong and to adhere to the right at the times in question. Major Saul Faerstein, the Army doctor who examined the accused first, but who was the last to testify, diagnosed his condition as a paranoid personality disorder. The other Army doctors, Dr. Anderson and Dr. Ira Feirstein, testified to the same diagnosis. Thus the government's expert witnesses were agreed that what David Day suffered from was a character and behavior disorder rather than a mental condition.

■ Appellant contends that "the *entire* testimony of the Government psychiatric witnesses must be stricken" (Brief, p. 15 and p. 18) and that the accused was unlawfully prejudiced by the reception of their testimony. It appears that during the cross-examination of Major Faerstein, the last government witness, defense counsel referred to the initial interview Major Faerstein had with the accused and asked:

Q. Did you give him any form of warning?

A. No, I did not. I'm not sure what kind of warning you referred to.

Despite knowledge of the absence of any warning, defense counsel did not move to strike Major Faerstein's testimony, but continued to cross-examine him at length (R.859 to R.892) and elicited from him a number of unwarned statements made by David Day to the witness. On the next trial date following the completion of the psychiatrist's testimony, the defense counsel moved to strike his entire testimony on the ground that warnings required by Article 31 of the Code, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *United States v. Tempia*, 16 U.S. C.M.A. 629, 37 C.M.R. 249 (1967) had not been given. Further, he moved to strike the testimony of Dr. Anderson and Dr. Ira Feirstein on the ground that their testimony was "fruit of the poisonous tree" since Major Faerstein had passed on to the other doctors "tainted information" he had obtained from the accused; and on the further ground that full and proper warnings had not been given by *them* to the accused.

The end result of these motions was that the judge struck out *in part* the testimony of each of the government doctors. He went through the transcript and indicated the testimony stricken by bracketing. He struck out every single specific answer or statement made by David Day testified to by the doctors. Their remaining testimony dealt with their ultimate conclusions, diagnoses, methodology, procedures and general psychiatric ideas and concepts. We need not examine the correctness of the judge's action with regard to the testimony he excluded, except to say that he probably erred in striking testimony which the defense counsel himself elicited from Major Faerstein knowing that no warning had been given. *United States v. Gustafson*, 17 U.S. C.M.A. 150, 37 C.M.R. 414 (1967). It is enough to observe that what was excluded was not considered by the trial court in arriving at the conclusion that David Day was mentally responsible for his offenses; it was not considered by the staff legal officer and the convening authority in approving the conviction; and our appellate court has not utilized or considered it in deciding to affirm. Cf. *United States v.*

*Starr*, 23 U.S.C.M.A. 584, 50 C.M.R. 849, 1 M.J. 186 (1975); *United States v. DeLeon*, 5 U.S.C.M.A. 747, 19 C.M.R. 43 (1955).

■ The contention that the entire testimony should have been stricken is without basic merit. It is now settled law, that the answers to the standard trilogy of questions concerning the sanity of the accused (see para. 121, MCM 1969) as testified to by government doctors, and their conclusions as to his mental responsibility based on interviews with the accused conducted without warning him and advising him of his rights are admissible in evidence as rebuttal testimony. *United States v. Babbidge*, 18 U.S.C.M.A. 327, 40 C.M.R. 39; *United States v. Wilson*, 18 U.S.C.M.A. 400, 40 C.M.R. 112; *United States v. Schell*, 18 U.S.C.M.A. 410, 40 C.M.R. 122; *United States v. Ross*, 19 U.S.C.M.A. 51, 41 C.M.R. 51 (all 1969). Indeed, paragraph 140a(2) of the Manual as amended 27 January 1975 now provides:

> Where the defense presents expert testimony concerning the accused's mental condition, a Government expert, testifying in rebuttal, may testify as to his conclusions concerning the accused's mental responsibility or capacity based on interviews with the accused conducted without advising him of the (*Miranda-Tempia*) rights.

Also quite without merit is the contention that the "fruit of the poisonous tree" doctrine requires striking the testimony of two of the government doctors. See *United States v. Wilson*, supra; see also *United States v. Ross*, supra.

*United States v. Babbidge*, supra, was a landmark case. There, the accused had refused to cooperate in a pretrial psychiatric evaluation by Government doctors. When the defense called a medical expert to testify at the trial, the Government moved to exclude any such testimony unless the accused agreed to submit to an evaluation by Government experts. The court required the accused to do so as a condition precedent to the defense doctor testifying. The legality of the ruling was upheld by the

Court of Military Appeals. Its opinion stated:

When the accused opened his mind to a psychiatrist in an attempt to prove temporary insanity, his mind was opened for a sanity examination by the Government. His action constituted a qualified waiver of his right to silence under Article 31.

The decision in *Babbidge* was strongly influenced by the reasoning in *United States v. Albright*, 388 F.2d 719 (C.A.4, 1968). The opinion of that court observed that the "maintenance of a fair state-individual balance clearly required that the government be permitted to have the defendant examined".

■ Under the law, then, Day could not have remained silent when interviewed by the Government doctors, thus frustrating their evaluation, without forfeiting his right to present an insanity defense supported by an expert witness' testimony at the trial. However in the absence of proof that proper warnings had been given, he was entitled to the exclusion of testimony by the Government doctors as to statements made by him tending to show that he did the criminal acts charged. In the instant case the testimony of the Government doctors which had any tendency toward proving that the accused did the acts charged was excluded from evidence. Testimony tending to show that he possessed the requisite mental capacity to be criminally responsible for the acts charged did not have to be excluded. We find no prejudicial error in connection with the Government's psychiatric evidence. As indicated above, we have determined that the evidence of record was legally sufficient to, and did in fact, prove the mental responsibility of the accused for the offenses of which he was found guilty, beyond a reasonable doubt.

After the findings and during the presentencing proceedings the defense presented the testimony of a second psychiatric expert, Dr. Robert Sadoff, director of studies in legal psychiatry at the University of Pennsylvania. This post-conviction psychiatric testimony does not raise a reasonable doubt as to the accused's mental responsibility for the offenses.

■ Appellant also assigned as error that the accused was denied his right to a speedy trial. The accused was held in confinement 137 days from the date of the offenses until trial commenced on 27 February 1974. The period of delay between 18 October and 4 December 1973, 47 days, is attributable to defense-requests. The record shows also that the Government was ready to proceed to trial on 11 February 1974 but the defense requested the further 16-day delay. All told, the Government was responsible for substantially less than 90 days delay. Accordingly the presumption of a prejudicial violation of Article 10 UCMJ did not arise. *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971). The Government proceeded with diligence to bring the accused to trial; the assignment is without merit.

■ Another assignment of error asserts that the judge erred in denying the defense motion to dismiss the specification charging the accused with assault with a dangerous weapon on Charles Newton. The motion was made on the theory that there was an improper joinder of a minor offense with a major offense. See para. 26 *c* MCM 1969. The relatively minor charge, as compared with murder, alleged an occurrence 15 minutes after the murder and involved a surrounding circumstance. Accordingly it was permissibly joined with the other two offenses.

We do not deem it necessary to list the remaining assignments of error. We have examined them and, in our opinion, they lack merit and do not warrant discussion.

The findings of guilty and the sentence as approved by the Commander, First Coast Guard District, are found to be correct in law and fact, and are affirmed.

ROSENWASSER, YOUNG and LYNCH, Appellate Military Judges (concurring).

MAGUIRE, Appellate Military Judge (dissenting as to jurisdiction).

LYNCH, Judge, concurring:

I concur in the Opinion of the Court. However, I believe that further discussion of one assignment of error should be presented. The appellant has urged that the military judge erred in failing to exclude the entire testimony of the three government psychiatrists. The military judge, during the trial, did grant a defense motion to strike testimony of the government psychiatrists; the appellant argues however that the military judge did not exclude enough.

While the government may challenge, and an appellate court review, erroneous rulings by a military judge favorable to a defendant, this may be done, only for the purpose of determining whether other evidence which has been admitted is not illegally tainted. Such a review may not be for the purpose of obtaining consideration of the excluded evidence. See *United States v. Dandaneau*, 5 U.S.C.M.A. 462, 18 C.M.R. 86. As the Court of Military Appeals recently stated

> Thus, while an appellate court may consider the propriety of a trial ruling excluding evidence to the extent that the ruling affects other evidence which was not excluded, *DeLeon* clearly instructs that the excluded evidence itself may not be considered on appeal to establish an accused's guilt. *United States v. Starr*, 23 U.S.C.M.A. 584, 50 C.M.R. 849, 1 M.J. 186 (citing *United States v. DeLeon*, 5 U.S.C.M.A. 747, 19 C.M.R. 43).

Therefore in determining whether or not the military judge committed error in admitting (or not striking) some testimony of the government psychiatrists, the correctness of the military judge's decision to strike any testimony of the government psychiatrists can be reviewed by this Court.

It is my opinion that the military judge erroneously excluded the testimony of the government psychiatrists on the basis that the statements obtained from the accused were unwarned, since the record clearly establishes that the defendant waived any objections, on that basis, to the psychiatrists' testimony.

Questions involving waivers of rights have been before the courts several times. When the right involved is substantial and fundamental, appellate courts may not indulge in finding a waiver simply through a failure to object at the trial. In a record, however, that clearly shows knowledge of the existence of a right by the defendant and there is not only a failure to object but also affirmative eliciting of, and reliance upon, objectionable evidence by the defense, waiver can be found. See, e. g., *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; *United States v. Catt*, 23 U.S. C.M.A. 422, 50 C.M.R. 326, 1 M.J. 41; *United States v. Airhart*, 23 U.S.C.M.A. 124, 48 C.M.R. 685.

The testimony of the three government psychiatrists covers 128 pages of the record of trial, not including the preliminary questions concerning qualifications. Direct examination covers 42 pages and cross-examination by the defense covers 86 pages. During the early stages of cross-examination of each of the government psychiatrists the defense counsel asked whether or not a warning had been given to the defendant. Having been given answers indicating that no adequate or complete warning of the defendant had been given during any of the interviews, the defense counsel proceeded to elicit answers to questions pertaining to what the defendant had said during the interviews, and the psychiatrists' interpretations of what the defendant had said. During the cross-examination of the three government psychiatrists over 200 questions were posed specifically calling upon the witnesses to testify as to what the defendant said during the interviews, and their interpretation of what the defendant said. Questions were asked by defense such as

"Did he discuss . . ."

"Did he at any time mention . . ."

"Did he say that . . ."

"Did he tell you in the course of this interview . . ."

"Do you recall him saying . . ."

"Go over this description as related to you by the patient . . ."

It was not until after all three government psychiatrists had testified both on direct and extensive cross-examination that defense counsel made his motion to strike.

A review of the record makes it clear to me the defense knowingly and willing elicited specific pretrial statements made by the defendant to the three government psychiatrists during their cross-examination, having been previously informed that no adequate warnings had been given to the defendant prior to the interviews. The defense having put these numerous statements of the defendant before the military judge then attempted to "unring the bell" by making a motion to strike. The tactic of the defense worked, because the military judge "fell into the trap" and partially granted their motion.

In my opinion the defendant, through his attorneys, waived any objection to the admissibility of his pretrial statements to the psychiatrists, and therefore the military judge's ruling excluding some of the psychiatrists' testimony on the basis of an inadequate warning to the defendant was erroneous. Since, in my opinion, the ruling of the military judge was erroneous, his admission of some of the testimony was correct, and it was not error for him to fail to exclude *all* of the psychiatrists' testimony.

MAGUIRE, Judge, dissenting as to jurisdiction:

I completely agree with the Opinion of the Court in disposing of all substantive and procedural questions posed except for that dealing with the matter of jurisdiction. The problem there is whether the Commander, Third Coast Guard District, had the power to convene a general court-martial. After a slow start, in which he failed to cite any authority for convening a court, the Commander relied on Section 0102 of the *Coast Guard Supplement to the Manual for Courts-Martial, United States.*

Historically, this authority has been attacked twice before. Once, in the case of a special court-martial, the issue was held irrelevant since the convening authority was held to have his power directly from

the Act of Congress (UCMJ). In the other, this same Commander, Third Coast Guard District, having cited 0102, after a preliminary ruling in favor of his jurisdiction by a military judge, withdrew the charges from the court and thus avoided a confrontation. It can be seen, however, that the issue raised at trial has been a potential of which the military justice system has been on notice for some time.

It is tempting not to dissent in this case because, in the analysis, it is all too true that a "stroke of the pen" can be said to be the difference between a well-founded and well-sustained edifice based on carefully developed plans and rubble created by a construction engineer's failure to convert an architect's line into a practical order. The fault exists, nevertheless, and it is characteristic of a system impatient with detail. We deal here with, apparently, hastily put together statutory language, broad organizational orders, and administrative Parkinsonian ravels. It is with great diffidence that the complexities of the written words here must be approached.

The review of the Staff Judge Advocate specifically adopts, as dispositive of the question of jurisdiction, the argument made in open court by the trial counsel and the ruling thereon of the Military Judge denying the defense motion to dismiss on jurisdictional grounds. The argument of trial counsel is simply that by 0102 of the *Coast Guard Supplement to the Manual for Courts-Martial*, the Secretary of the Treasury designated Coast Guard district commanders as convening authorities for general courts, that the designation survived the transfer to the Department of Transportation by virtue of subsection 12(a) of the Department of Transportation Act and of Department of Transportation Order No. 1100.1 in which the Secretary confirmed the enduring validity of 0102 by his personal act duplicating the operation of the statute, and that "until the Secretary of Transportation says (in effect), 'I terminated Section 0102, or I modify substantive Section 0102'" the designation remains effective. The Military Judge adds to this that "all

actions by the Commandant to delegate a General Court-Martial Convening Authority . . . are null and void, as was recognized after an attempt was made in 1970, in early 1970 to designate the Superintendent of the Academy a General Court-Martial Convening Authority."

Subsidiarily, presumably because of an attack on the Coast Guard Supplement as inadequate because of a failure to acknowledge on its face that it supplemented the new, 1969 Manual, and not the original 1951 Manual, trial counsel also declared that the Secretary of Transportation had properly delegated to the Commandant of the Coast Guard (by DOT Order No. 1100.0) the power to amend the Supplement, but that the Secretary, by reason of paragraph 8 of Change No. 2 to that Order, had not delegated the non-delegable power to designate GCM convening authorities, and that the Commandant "wisely and clearly reading the Manual . . ." had chosen not to do so. The change made to 0102 by the Commandant is, accordingly, characterized as "minor," and "not substantial," and it is declared that had he in fact made a substantial change it would have been of no force and effect. This is apparently, what the Military Judge affirmed in his ruling.

A measure of hindsight has gone into this ingenious justification, and certain historical facts must be recalled.

## II

DOT Order No. 1100 of 31 March 1967 clearly and unambiguously delegated to the Commandant of the Coast Guard all powers of the Secretary pertaining to the Coast Guard except those specifically reserved to the Secretary. The authority to designate convening authorities and the authority to promulgate, modify, amend, or terminate the Supplement to the MCM were not powers reserved to the Secretary. However, paragraph 7 of the Order declared that the Order was not intended to delegate a power not delegable by reason of "statute, Executive Order or other directive."

Whatever the Secretary may have thought, on 1 May 1967 the Chief Counsel of the Coast Guard advised that the power to designate convening authorities had been delegated to the Commandant of the Coast Guard. 375 Coast Guard Law Bulletin. Additionally, on 3 May 1967, the Commandant asserted that the power to amend the Coast Guard Supplement had been delegated to him and he did amend 0102, such as to change it from a designating statement to a reflection of an act done by another. To the time of the commencement of the trial in this case there had been no repudiation announced by the Secretary, the Commandant, or the Chief Counsel of either assertion of authority.

However, in 1970, *United States v. Greenwell*, 19 U.S.C.M.A. 460, 42 C.M.R. 62, declared that under the Code the power to designate convening authorities was non-delegable.

(It has not (apparently) been argued that the *Greenwell* decision does not apply to the DOT and Coast Guard, but since the ingenious concept is possible it may as well be disposed of. The theory would be that the Secretary of Transportation is under a different set of rules from those controlling the secretaries of the military departments. When all pertinent powers of the Secretary of the Treasury were transferred to him, Congress, by the same Act, conferred on him the authority "in addition to the authority . . . contained in any other Act . . ." to "delegate any of his residual functions, powers, and duties to such officers and employees of the Department as he may designate . . ." As a later statute, creating a new Secretary, this could be urged to have removed a limitation that still restricts the other secretaries and to authorize, *carte blanche*, delegation.)

(The reply is easy. First, while I am not certain what "residual" functions and powers are, I think that the general grant, although later in time, does not operate to expand an authority to delegate specifically limited by the primary, controlling statute. Second, although the Secretary of the Treasury had just such delegatory powers for his own department vested in him by Reorganization Plan 26–50, the UCMJ in creat-

ing new powers and authorities in 1951 *pro tanto* limited the Secretary's general power to delegate under the Plan. Since what was transferred from Treasury to Transportation in this area was no more than what Treasury had, the collateral general grant of delegation powers to Transportation was still subject to the limitations imposed by the UCMJ itself.)

### III

The status of Secretarial delegations since 1970 is a perplexing matter. At 35 FR 4995, on 21 March 1970, the Secretary published, pursuant to law, a statement of the organization of his Department and exercised his powers to delegate authority to Administrators and Staff Members. Codification appears at 49 CFR 1. Pertinent to the functions of the Coast Guard are four sections.

In 49 CFR 1.43 the Secretary declares that any powers and duties not delegated by him in Subpart C are reserved to him. In 49 CFR 1.44 he reserves certain specific powers. Item (m) of the enumeration specifies twelve functions bearing upon the Coast Guard. Among these are the personal authority granted to him by statute to convene general courts-martial. This is essentially irrelevant to the issue but is indicative of the kinds of authority reserved. Among the powers not specifically reserved there is no mention of the power to designate convening authorities or of that to promulgate regulations pursuant to the UCMJ.

In 49 CFR 1.45 there is a general grant to all Administrators in the Department to "exercise the authority of the Secretary over and with respect to any personnel within their respective organizations," and another one to "exercise the authority of the Secretary as executive head of a department, under any statute, Executive order or regulation." Without more, this purports to vest in the Commandant the very powers involved in this case.

49 CFR 1.46 spells out specific delegations to Commandant. These are divided into categories "(a)" through "(r)." All the items in this list deal with specific sections of Titles 10 (not involving the UCMJ), 14, 18, 33, and 46 of the United States Code and certain Executive plans and orders, covering law enforcement and public administration. Item (b), a catch-all, provides for carrying out:

". . . all the activities of the Coast Guard, including, but not limited to, law enforcement, safety of life and property at sea, aids to navigation, search and rescue, ice breaking, oceanographic research and military readiness functions (49 U.S.C. 1655(b)(1))."

The cited subsection of the U.S.Code is that which transferred generally to the Secretary "all functions, powers, and duties, relating to the Coast Guard, of the Secretary of the Treasury . . ." The precision of the statutory grant and its extent and meaning are questionable. The precision of the Secretarial grant is even less clear, but while the stated functions are all of the Coast Guard's "external-operations-class" the "activities of the Coast Guard" would be presumed to include internal affairs. If a distinction was intended, however, the grant in 1.45(a) takes care of the internal administration.

Most significantly to the point, there is no regulation similar to the cautious reservation of paragraph 7 of DOT Order No. 1100. The Secretary has not seen fit to express in his public statement of delegations any intent that non-delegable powers should not be considered delegated by Subpart C of 49 CFR.

The question of whether the Federal Register publication and the incorporation into the Code of Federal Regulations of the delegations nullified and superseded the DOT Orders earlier issued on the same subject need not be debated. The regulations serve most strongly to point up the confusion that existed in this area on 21 March 1970. There can be no doubt that on 22 March 1970 the Secretary, the Commandant, and all others concerned believed that the power to designate convening authorities had been delegated to the Commandant. Although *Greenwell* erupted two

months later, on 26 May 1970, no action, it is repeated, was taken by anyone to bring about accord between DOT–Coast Guard practices and the law.

## IV

There is, of course, a clear distinction between the power to designate convening authorities and the power to regulate by means of the Coast Guard Supplement, although the denomination of the latter power is confused by language. What we are really talking about in that instance, stripped of its association with the names of existing publications, is the power to make regulations touching on the administration of military justice under the Code, not about some vaguely defined power to make regulations "for the Coast Guard." It is a historical fact but not one flowing from necessity that the Secretary of the Treasury chose to use a "Supplement to the Manual for Courts-Martial" as the vehicle for making designations of convening authorities.

The position that the Secretary of Transportation did not delegate the appointing power to the Commandant is one arrived at under the compilation of the *Greenwell* holding. The actual intent to make the delegation and the inference by the delegate cannot be doubted, as of 1967. The reservation claimed now by reason of paragraph 7 of the 31 March DOT Order can best be characterized as inadvertent. The power to amend the regulations (in this context, the power to amend the Supplement to the MCM) involves a different question.

The Secretary can have rule-making authority under the UCMJ from either of two sources: from a provision of the Code itself, or by delegation of Presidential power authorized by Article 140. Congress gave a Secretary no power to subdelegate any regulation-making authority vested directly by the UCMJ as it did to the President, with respect to his regulation-making authority, in Article 140. The President did not authorize the further subdelegation by a Secretary of any power he, the President, had

vested in the Secretary under Article 140. It seems inescapable, then, that insofar as the Supplement to the MCM purports to make regulations for the conduct of courts-martial, the power to do so was not delegable to the Commandant and, by reason of paragraph 7 of DOT Order 1100.1, was not delegated. However, all parties appear to agree that the power was so delegated (fortunately the purported exercise of the power under further subdelegation by the Chief of Staff and the Chief Counsel of the Coast Guard is not involved here at all), and there is no need further to belabor the point because in the ultimate issue the result is the same.

## V

Consideration must be given here to an important hypothetical condition. Let it be supposed that the precedent established in the Treasury Department had been followed in May 1967 and that the Secretary of Transportation had promulgated Amendment 16 to the Supplement to MCM, with the new language identical to what Amendment 16 in fact used. There could be no doubt that 0102 had been amended within the meaning of subsection 12(a) of the DOT Act. The old language was out. For good or ill the new language was in. The Secretary would have wiped out the designations and substituted instead a statement of history. He would have failed to supplant designating language with designating language. He would have abolished the old designations without, as he had full authority to do, establishing new ones. This would have been unintended, but the enactment of defective language does not serve to effectuate a good intent. If the legislator intends to confer a benefit on A, B, and C, after due deliberation, and if the enacted language omits C as a beneficiary, all the good will in the nation will not authorize granting the benefit to C; remedial legislation is the only effective way to correct the mistake. Administrative *largesse* will not do.

**1180**

## VI

What it all comes to in this case is this: the designation by the Secretary of the Treasury was perpetuated, under the statute, "until modified, terminated, superseded, set aside, or repealed by the Secretary . . . (or) Administrators . . . (in the exercise of any authority respectively vested in them by this Act) . . ." The designating statement, 0102, was modified so that it ceased to exist, by virtue of the statute, as it had been and therefore was only what it was, and was no longer a designation. The Secretary of Transportation has ratified the acts of his purported agent; the modification is his own act and, willy-nilly, has extinguished the appointments made by his predecessor in authority. The afterthought of using paragraph 7 as a "Catch 22" to revivify a document that no longer exists, legally or in fact, makes the ascertainment of jurisdiction akin to a game of "Button! Button! . . ."

It does not matter what anyone thought or intended; what matters is what was in fact stated and done. It is only in the absolute dictatorship of one man that the intent of the lawgiver can be found to nullify his actual edict. If it be thought that to accept seriously the attack on the jurisdiction in this case is to play skittles with the grave matter of dealing with a homicide, the recitation of this history of delegation and non-delegation is a most telling *tu quoque* and, for a time at least, appellant's own amenability to capital punishment was on the line. Criminal law requires strict construction and the jurisdiction of a tribunal created by statute must be meticulously handled or it vanishes. To my mind, it vanished in 1967 and no amount of prestidigitation, with all the good will in the world, can change the illusion of authority into reality.