UNITED STATES, Appellee,

v.

**Martice R. ENGLISH, Private First Class, U.S. Marine Corps, Appellant.**

No. 96–1063.

Crim.App. No. 94 1776.

U.S. Court of Appeals for the Armed Forces.

Argued May 13, 1997.

Decided Sept. 29, 1997.

Crawford, J., filed dissenting opinion.

For Appellant: *Commander Carol J. Cooper*, JAGC, USN (argued); *Lieutenant Kathryn L. Clune*, JAGC, USNR.

For Appellee: *Lieutenant Randy S. Kravis*, USMC, JAGC, USNR (argued); *Colonel Charles Wm. Dorman*, USMC and *Lieutenant Jonathan W. Haray*, JAGC, USNR (on brief).

*Opinion of the Court*

EFFRON, Judge:

Contrary to his pleas at a special court-martial, appellant was convicted of attempted malingering, failure to go to his appointed place of duty, and malingering, in violation of Articles 80, 86, and 115, Uniform Code of Military Justice, 10 USC §§ 880, 886, and 915, respectively. The military judge, sitting alone, sentenced him to a bad-conduct discharge, confinement for 60 days, forfeiture of $542 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Criminal Appeals affirmed the findings and sentence. 44 MJ 612 (1996).

On appellant's petition, we granted review of the following issues:

**I**

WHETHER THE LOWER COURT IN-CORRECTLY HELD THAT APPEL-

LANT'S CASE WAS A PROPER CASE FOR A "SUBSTITUTE" RCM 706 SANITY BOARD WHEN THE PRIOR EXAMINATIONS CONDUCTED UPON APPELLANT: (1) WERE NOT SUFFICIENT TO CONSTITUTE AN RCM 706 EXAMINATION, AND (2) FORMED THE BASIS OF CHARGE I, MALINGERING BY FEIGNING A MENTAL ILLNESS.

## II

WHETHER THE LOWER COURT INCORRECTLY HELD THAT IT WAS PERMISSIBLE FOR APPELLANT'S RCM 706 DOCTORS TO TESTIFY AGAINST HIM DURING THE GOVERNMENT'S CASE IN CHIEF ON THE CHARGE OF MALINGERING, IN VIOLATION OF Mil.R.Evid. 302.

■ We hold that, under the circumstances of this case, the military judge erred in concluding that the prior examinations of appellant constituted an adequate substitute for a mental responsibility board under RCM 706, Manual for Courts–Martial, United States (1995 ed.).[1]

## I

The pertinent charge against appellant, that he feigned mental illness to avoid military duties, grew out of his efforts to obtain mental health assistance to address what he described as feelings of depression and thoughts of suicide. On three separate occasions, he received treatment from a Navy psychiatrist. Between the second and third visits, he made a suicidal gesture by taking an overdose of non-prescription pain medication. The Navy psychiatrist concluded that appellant was malingering and reported that conclusion to appellant's chain of command, along with a recommendation that appellant be separated from the Marine Corps.

Appellant subsequently was examined by a Navy clinical psychologist, who concluded that appellant was exaggerating his symptoms in an effort to obtain a discharge. Appellant then was charged with malingering by feigning a mental illness under Article 115. The primary evidence supporting this charge was provided by the two mental health professionals.

At the outset of the trial, defense counsel submitted a motion to the military judge requesting appointment of a board under RCM 706 in order to determine appellant's mental responsibility and ability to stand trial. Defense counsel proffered facts to support the motion, explained why he believed the examination was necessary, and contended that there was a reasonable basis for the request.

The Government contested the need for such an examination and also argued that the equivalent of an RCM 706 board already had been conducted by the combined efforts of two Navy doctors. The military judge did not address the need for such an examination but denied the defense motion on the grounds that the examinations by the two Navy mental health professionals constituted an adequate substitute for an RCM 706 board.

Subsequently, for reasons unrelated to this appeal, a second military judge was detailed to preside. During his opening statement, trial counsel stated that he intended to prove the malingering charge through the testimony of the two mental health professionals. Defense counsel moved to preclude the Government from calling either mental health professional on the ground that statements made during an RCM 706 board were privileged and could not be disclosed over the objection of the person who had been examined. Although the Manual for Courts–Martial does not recognize a general doctor-patient or psychotherapist-patient privilege,[2]

---

1. Issue II (regarding use of appellant's statements to mental health professionals) is rendered moot as a result of our disposition of Issue I (holding that the mental examinations did not constitute a substitute RCM 706 board).

2. See Mil.R.Evid. 501(d), Manual for Courts–Martial, United States (1995 ed.); but cf. Jaffee

v. Redmond, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996); 62 Fed.Reg. 24643 (May 6, 1997)(proposed change to Mil.R.Evid. regarding "Psychotherapist–Patient Privilege"). Appellant

there is a limited privilege under Mil.R.Evid. 302, Manual, *supra*, covering statements made during an examination into the mental condition of the accused under RCM 706.

The military judge rejected the defense motion on the rationale that neither of the mental health professionals was functioning as an RCM 706 board at the time appellant's statements were made and that the statements were not otherwise privileged.

## II

### A

The issues raised by appellant in this case do not call into question the propriety of using testimony from mental health professionals to prove a charge of malingering or challenge the sufficiency of the evidence provided by such testimony in this case. The question raised by the first granted issue is whether the testimony of a mental health professional, which provides the primary evidence against the accused on the merits of a charge, also can be used to fulfill the purposes of inquiry into the mental condition of the accused under RCM 706.

In military law, as in civilian law, an accused may assert that he or she lacks the mental capacity to stand trial or lacked the requisite mental responsibility at the time the offense was committed. RCM 909 and 916(k). Although the standards for granting relief on these matters have changed over time, the underlying motions have been a traditional feature of military law. *See, e.g.,* W. Winthrop, *Military Law and Precedents* 294–96 (2d ed. 1920 Reprint); para. 120, Manual for Courts–Martial, United States, 1951.

There is a six-step process for assessing questions regarding the mental health of an accused.

First, "[i]f it appears ... that there is reason to believe that the accused lacked mental responsibility for any offense charged or lacks capacity to stand trial, that fact and the basis of the belief or observation shall be transmitted ... to the officer authorized to

order an inquiry into the mental condition of the accused." RCM 706(a).

Second, based on such information, a mental examination may be ordered. The authority generally resides in the convening authority prior to referral of charges and in the military judge after referral. RCM 706(b).

Third:

When a mental examination is ordered ..., the matter shall be referred to a board consisting of one or more persons. Each member of the board shall be either a physician or a clinical psychologist. Normally, at least one member of the board shall be either a psychiatrist or a clinical psychologist.

RCM 706(c)(1).

Fourth, the order referring the matter to the board "shall contain the reasons for doubting the mental capacity or mental responsibility, or both, of the accused, or other reasons for requesting the examination." RCM 706(c)(2).

Fifth, the board must issue a "report as to the mental capacity or mental responsibility ... of the accused," RCM 706(c)(1), addressing at a minimum four specified questions concerning mental capacity and mental responsibility. RCM 706(c)(2).

Sixth, the report must be in a two-part format. The first part, which consists only of the board's conclusions, is provided to counsel for both sides, the military judge, and other personnel involved in processing the court-martial. The full report, which may include statements of the accused to the board, is released only to medical personnel and defense counsel. The accused's commanding officer may request a copy of the full report, RCM 706(c)(3), but disclosure of the accused's statements to the board to the trial counsel generally is prohibited, RCM 706(c)(5), in order to protect the accused's privilege against self-incrimination. *See* Art. 31, UCMJ, 10 USC § 831; Mil.R.Evid. 302.

has not claimed that the information in this case    was privileged under such a general rule.

B

As noted above, the military judge did not determine whether there was an adequate basis for an RCM 706 board but proceeded on the basis that the examinations by the two mental health professionals was an adequate substitute. In these circumstances, the first two steps of the process (an adequate basis for raising the issue of mental capacity and the need for a mental examination) are not the focus of the granted issue in this case.[3] The central issue here is whether the military judge erred when he ruled that the prior examinations of appellant complied with the third and succeeding steps concerning the role of a "board" in examining the mental capacity and responsibility of appellant.

The Government does not contest the fact that the proceedings in this case did not follow the specific provisions of RCM 706, which require the military judge to refer the issue of appellant's mental responsibility to a "board" for issuance of a specific report under procedures that strictly control disclosure of privileged information. The Government relies on the conclusion of the court below that the earlier examinations of appellant constituted an adequate substitute for the requirements of RCM 706, citing the opinion of the Army Court of Military Review (now the Court of Criminal Appeals) in *United States v. Jancarek*, 22 MJ 600 (1986).

In *Jancarek*, defense counsel requested a sanity board to determine whether the accused had the capacity to stand trial. The Government opposed the motion on the ground that the accused "had already been evaluated by a psychiatrist who had determined that appellant had the mental capacity to stand trial." 22 MJ 600. The military judge, after considering testimony from the psychiatrist, ruled that the accused did not lack capacity to stand trial. On appeal, the then-Court of Military Review stated that "in a proper case there can be a substitute for a

sanity board and ... this is such a case." 22 MJ at 603.

■ A key distinction between *Jancarek* and the case before us is that the accused in *Jancarek* "had already been evaluated by a psychiatrist who had determined that appellant had the mental capacity to stand trial," not by a psychiatrist and clinical psychologist who had treated him for a purported suicidal gesture and were material witnesses against him at trial. 22 MJ 600; *see id.* at 604 & n. 7. The examination of appellant in the present case was solely for purposes of treatment, with no focus on the judicial standards of mental capacity or responsibility. The court in *Jancarek* also emphasized "the important task of limiting access to privileged information" disclosed during an RCM 706 examination. 22 MJ at 603. In the present case, however, the communications between appellant and the mental health professionals provided the foundation for the criminal charge against him. We hold that the after-the-fact efforts of the military judge to restrict future conversations between trial counsel and the mental health professionals provided an inadequate substitute for an RCM 706 board and the privilege accorded appellant through that board. Had there been a proper RCM 706 board examination, it is highly unlikely that the testimony of the mental health professionals, to the extent that they were based on the statements of appellant, would have been admissible against him. *See* Mil.R.Evid. 302.

C

Nearly 30 years ago, this Court grappled with the thorny issue of whether an accused, after raising the issue of mental capacity or mental responsibility, may be compelled to submit to a mental health examination in light of Article 31(a)'s protection against compelled self-incrimination. Our Court concluded that the structure of board proceedings and the limitations on use of information

---

**3.** The dissent discusses cases that involve review of a ruling of the military judge as to the need for an RCM 706 board. If the military judge here had so ruled, the case before us would be in a different posture. The military judge, however, went directly to the question of whether the

earlier examinations could serve as a substitute 706 board, without deciding whether defense counsel had made a satisfactory showing of the need for one. In this context, the cases cited by the dissent are not controlling.

obtained in those proceedings provided an adequate basis to reconcile the tension between the privilege against self-incrimination and the competing need for a mental health examination of an accused in such circumstances. *See United States v. Ross*, 19 USCMA 51, 41 CMR 51 (1969); *United States v. Wilson*, 18 USCMA 400, 40 CMR 112 (1969); *United States v. Babbidge*, 18 USCMA 327, 40 CMR 39 (1969). In *Babbidge*, we emphasized that the privilege against self-incrimination was not violated because " 'the purpose of the examination is not to determine whether a defendant did or did not do the criminal acts charged, but whether he possessed the requisite mental capacity to be criminally responsible therefor, *if other proof establishes that he did do them.*' " 18 USCMA at 331, 40 CMR at 43, quoting *United States v. Albright*, 388 F.2d 719, 725 (4th Cir.1968)(emphasis added).

In *Ross*, our Court noted that "[t]he significant determinant is that the psychiatric examinations tended to prove not the commission of a crime but whether the accused should be held responsible for it." 19 USCMA at 54, 41 CMR at 54. In the present case, by contrast, the primary import of the testimony from the mental health professionals was to prove the commission of the crime. Such circumstances, involving reliance on the testimony of prosecution witnesses regarding the merits of charges against an accused, would undermine the delicate balance struck by *Babbidge* and its progeny, which is embodied in the procedures set forth in RCM 706 and the privilege provided in Mil.R.Evid. 302.

### D

The assignment of responsibility for conducting an inquiry into the mental capacity or responsibility of an accused to a "board" of health care professionals is a longstanding feature of military law. *See, e.g.*, para. 219 ("medical board"), Manual for Courts-Martial, U.S. Army, 1917. The current Manual, like its predecessors, contains unambiguous requirements for referral of mental capacity and mental responsibility issues to a board,

with no provision for reliance on a substitute board.

We need not decide today, however, whether an examination that fulfills the purposes of RCM 706 and Mil.R.Evid. 302 could be treated, in a proper case, as an adequate substitute; whether use of such a substitute would constitute harmless error; or whether no such substitute should be permitted. Under the circumstances of the case before us, we hold that it was error for the military judge to rely on the witnesses, whose testimony formed the basis of the prosecution's evidence on the merits of the charge, to serve also as a substitute for the carefully crafted procedures set forth in the Manual.

### III

The military judge did not directly address the merits of appellant's request for a sanity board and may have foreclosed appellant from a full opportunity to justify his request. Accordingly, if the court below does not otherwise set aside the findings and sentence, it may order a factfinding hearing to give appellant an opportunity to meet his burden of showing the need for a sanity board or give him the benefit of the doubt and order a sanity board. If there is a sanity board that makes findings favorable to appellant, the court may set aside the findings and sentence and authorize a rehearing.

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to the Court of Criminal Appeals for further proceedings. Thereafter, Article 67(a), UCMJ, 10 USC § 867(a) (1994), will apply.

Chief Judge COX and Judges SULLIVAN and GIERKE concur.

CRAWFORD, Judge (dissenting):

The issue in this case comes down to a matter of form versus substance. Appellant was not entitled to a sanity-board hearing under RCM 706, Manual for Courts–Martial, United States (1995 ed.). Even assuming that appellant was entitled to an RCM 706

hearing, the mental examinations of appellant by Doctor Hammer and Lieutenant (Lt) Rogers were an adequate substitute. In any event, non-privileged information is not made privileged by virtue of the substitution. Appellant's statements during his mental examinations were not privileged when made. The fact that appellant later requested an RCM 706 hearing does not retroactively render those statements privileged. The purposes of the RCM 706 sanity board and the confidentiality privilege which accompanies it were well met by the rulings of the two military judges detailed to appellant's case. Appellant suffered no prejudice as a result of their decisions on these matters. To hold otherwise would be to exalt form over substance; and it is for this reason that I dissent.

## FACTS

Between January and May 1993, appellant tried many ways to feign both mental and physical afflictions for the purpose of being discharged from the Marine Corps.

In mid-January, appellant told Private First Class (PFC) Torres that he no longer wanted to be in the Marine Corps.

On January 25, 1993, appellant was transferred to the Holding Platoon for Student Administration Company at the School of Infantry. Again he told fellow Marines he wanted to get out of the Marines because of his knee injury. On January 27, appellant told PFC Torres that if his knee did not give him that ticket to get out, he would "get out on a psyche evaluation." On February 4, appellant told another Marine that if his knee did not get him out, he would get out "somehow" and that he "would do anything to get out." At the Holding Platoon, there had been five or six suicide attempts.

On January 29, appellant swallowed a number of pills as a suicide gesture. Appellant told Staff Sergeant Voegtlin that he had proven his point and would not have to play any more games. That point was to be discharged one way or another.

On May 11, appellant was on light duty following an appendectomy on April 30. He told Field Corpman McGinnis that he wanted to be put on bed rest. Appellant did not look like he was in pain, and McGinnis informed appellant that he could not just be put on bed rest but needed to see a doctor if he was ill. Appellant left without seeing the doctor. Although appellant was not given a chit for bed rest, when he reported to Sergeant Conran, his duty handler, the chit had been checked for bed rest. The investigation showed no authorized person had checked his chit.

After appellant made complaints concerning depression and thoughts of suicide, he was referred to the psychiatry clinic at Naval Hospital, Camp Pendleton. As part of this treatment, he had been seen three times by Doctor Hammer, a Navy psychiatrist. Between his second and third visits, appellant made a suicidal gesture.

Doctor Hammer diagnosed him with a narcissistic personality disorder. Doctor Hammer concluded that this personality disorder was not serious enough to warrant a discharge. Doctor Hammer said in his report that the suicide attempt on the 29th of January was "manipulative in nature" and was not done because of the existence of "a major mental illness." Doctor Hammer believed appellant was malingering and feigning symptoms for his own personal gain. Doctor Hammer based his diagnosis on appellant's "vague and ill-defined" symptoms, including any inconsistent statements and admissions during the final session concerning the suicidal gesture. In fact, appellant told Doctor Hammer that his purpose was to get out of the Marine Corps. Doctor Hammer ultimately recommended appellant's separation.

Following Doctor Hammer's diagnosis, appellant was referred to a follow-up separation group. During interaction with the separation group and conducting individual testing, Lt P.A. Rogers, a clinical psychologist, concluded appellant was exaggerating symptoms of depression to obtain a discharge. Lt Rogers noted that appellant showed signs of unhappiness; however, she testified that unhappiness was not a sign of mental illness.

On April 5, 1993, after appellant was charged with feigning illness, the defense requested a psychiatric board under RCM

706. The Government opposed this request on the grounds that Doctor Hammer and Lt Rogers had already evaluated appellant's mental status, and their examinations were the equivalent of an RCM 706 evaluation. Appellant, in response, claimed those examinations were insufficient because appellant had not reported that he was molested as a child during his sessions with Doctor Hammer.

Doctor Hammer testified that knowing appellant had suffered child abuse would not change any of his previous answers if given as part of an RCM 706 board. He noted that this knowledge might contribute to a different diagnosis of post-traumatic stress disorder. He would not have run any tests, although he would have read appellant his rights. Questioned by the judge, Doctor Hammer indicated that the RCM 706 boards were done by only one doctor at Camp Pendleton where appellant was stationed.

Lt Rogers also testified that she would not have gathered any additional information if she was part of an RCM 706 board. She said she would have asked different questions and maybe would have done a brief interview or talked to Doctor Hammer because she would feel it was her responsibility to do the initial interviews. However, based on her interview, she would say appellant had sufficient mental capacity to understand the nature of the proceedings and cooperate in his defense. She responded that she would not have done any more testing as part of a 706 board. Again, Lt Rogers repeated, in response to a defense cross-examination question, that she would have re-asked questions because she did not do the initial interviews. On re-direct she again reiterated she would not have needed any more answers to do an RCM 706 board to answer the requisite questions.

The defense argument at trial was that because the doctors did not know of child abuse, there should be a new examination. There was no proffer of additional information and no proffer as to what another person in the mental-health field would have done in this situation. Instead, the defense argued

that since appellant was not in the brig, he did not have to have a guard on him. Therefore, they could easily do another examination. There was no allegation that the defense could not talk to other people in the mental-health field and get an additional opinion to make a proffer to the judge.

## DISCUSSION

### I

On the first issue, there was no clear abuse of discretion when the military judge found appellant's situation an appropriate circumstance for a substitute sanity board. In fact, there is much to support her decision.

As the lower court properly noted, the language of RCM 706 "implies that some discretion is given to the trial judge. However, ... [the Drafter's Analysis] offers no insight as to how much discretion, if any, is given to a trial judge when such a request is made." 44 MJ 612, 614.

This Court set the standard for deciding whether a sanity board is proper in *United States v. Nix,* 15 USCMA 578, 36 CMR 76 (1965). There, we stated that "the motion should be granted if it is not frivolous and is made in good faith." 15 USCMA at 582, 36 CMR at 80. Despite changes in the Manual, this approach has remained intact. *See United States v. Kish,* 20 MJ 652, 655 (ACMR [1] 1985), and *United States v. Jancarek,* 22 MJ 600, 601 n. 1 (ACMR 1986).

Appellant reminds us that the military judge ruled that the motion was made in good faith. Appellant asks us to infer that the military judge found the motion not frivolous because she did not deny it outright. But appellant reads the word "frivolous" too narrowly. "Frivolous" can mean that, given the circumstances, a sanity board would offer the court little of weight or importance. *See United States v. Lesueur* (ACM 27181), 1989 WL 80865 (AFCMR June 13, 1989)(holding that where "the functional substitute of any evaluation which a sanity board might undertake" had been performed, military judge did

---

1. *See* 41 MJ 213, 229 n. * (1994).

not abuse his discretion in ruling that " '[c]onsidering the law, and the facts of record, ordering a sanity board in this case would be frivolous.' "). Unpub. op. at 1 (see appendix for full text of this opinion, omitting caption and counsel—47 MJ at 225).

Here, the military judge found that the substance of a sanity-board evaluation had been performed during the several weeks just prior to the trial by a psychiatrist (Doctor Hammer) and a clinical psychologist (Lt Rogers) whom appellant saw voluntarily on several occasions. The judge properly found that to order a new sanity-board evaluation would be redundant and would add little weight or importance to the determinations which these doctors could already provide.

Such a substitute sanity board is innovative, but not novel. When courts have examined the propriety of a substitute sanity board, they have begun with an inquiry into the purpose of the sanity board. In *Jancarek*, 22 MJ at 603, the then-Army Court of Military Review[2] defined the board's purpose as providing a method for detecting mental disorders not apparent to the layman to determine if the accused is fit to stand trial. That court also noted the specific form of the board detailed in RCM 706 and reasons for that form. But the conclusion of the court was unmistakable:

> The point is that we do not believe that the drafters selected the sanity board format because they had determined that no other procedure was capable of detecting mental disorders or determining an accused person's mental capacity or responsibility. That being the case, we believe we should look to the substance of the evaluation performed on the accused rather than its form.

22 MJ at 603.

That court listed several factors which distinguish a sanity board and which may indicate that a particular evaluation is the functional equivalent of a sanity board. They are:

- "participation of a psychiatrist or someone with 'similar expertise' ";

- performance "of a forensic mental examination";

- knowledge by the performing doctor(s) "of the reasons for doubting" the subject's "mental capacity";

- determination whether the subject is capable of standing trial;

- ability to examine and cross-examine the performing doctor(s) about the evaluation; and

- the opinion of the performing doctor(s) that no further evaluation would be needed to answer the questions required by RCM 706.

22 MJ at 603–04. In a later case, the Army Court of Criminal Appeals reaffirmed and expanded on that list of factors by including "a description of the examiner's familiarity with forensic evaluation or participation in previous sanity boards." *United States v. Collins*, 41 MJ 610, 613 (1994).

Appellant's case is replete with examples supporting the military judge's determination that this was an appropriate case for a substitute sanity board. (1) The evaluations were performed by a psychiatrist and a clinical psychologist, independently of each other. (2) Doctor Hammer and Lt Rogers testified that their examinations were substantively equivalent to the forensic mental evaluations contemplated by RCM 706 and answered the required questions on the stand. When the military judge ordered Hammer and Rogers to provide written reports of their evaluations as required by RCM 706, they knew of the pending court-martial and thus were able to provide their substitute sanity-board review with both (3) an understanding of the reasons for doubting appellant's mental capacity and (4) an answer to the question whether he possessed the capacity to stand trial. (5) Both Hammer and Rogers were examined and cross-examined by trial counsel, defense counsel, and the military judge under oath. (6) Both testified that there was no additional information needed to prepare a report conforming to RCM 706. (7) Both had conducted sanity boards in the past.

2. *See* n. 1, *supra.*

In addition, the military judge made a specific finding that at the time both Hammer and Rogers interviewed and tested appellant, they were neutral. And the military judge attached all the confidentiality protections of Mil.R.Evid. 302, Manual, *supra*, and RCM 706 to the reports which they would be providing to defense counsel—but not trial counsel—per her order.

Furthermore, the military judge invited defense counsel to proffer evidence that confidentiality could not be ensured because the Government already knew more than it should or that there was some change in appellant's behavior since he was last seen by Hammer and Rogers which would warrant further evaluation. Additionally, the military judge reminded defense counsel of the language of RCM 706(c)(2) and (c)(4) which provides the opportunity for additional questions to be answered by the sanity board in their report and for additional examinations to be requested. Other than referring to appellant's new adult recall of episodes of childhood molestation, defense counsel offered nothing. Interestingly, the defense motion was based on medical reports by Doctor Hammer and Lt Rogers indicating their full awareness of this "new" information when they evaluated him previously.

Given these circumstances, I cannot conclude that the military judge abused her discretion in finding the evaluations of Doctor Hammer and Lt Rogers to be an adequate substitute for a sanity board.

## II

I move now to the second issue in this case, whether the testimony of Doctor Hammer and Lt Rogers on the merits violated the confidentiality privilege afforded in a sanity board. Again, I conclude there was no clear abuse of discretion by the military judge.

The Rules for Courts–Martial limit the psychotherapist-patient privilege[3] to the statements of the accused and derivative evidence obtained through a sanity board. Mil. R.Evid. 302(a). The testimony elicited by the Government from Doctor Hammer and Lt Rogers was limited to that which was discoverable through appellant's medical records and from Hammer and Rogers prior to appellant's request for a sanity board. Both the initial military judge and her successor precluded the Government from questioning Hammer and Rogers on anything contained within the reports provided to defense counsel pursuant to the RCM 706 request, other than the final conclusions. The limited privilege provided by the Military Rules of Evidence for that report cannot be applied back to that which was not protected before the request.

The privilege is a narrow one meant to encourage the accused to speak openly with the persons performing a sanity-board review. The Rule arises from the "tension between the right against self-incrimination and the favored position occupied by the insanity defense." Mil.R.Evid. 302, Drafters' Analysis, Manual, *supra* at A22–7. If the accused wants to assert that he lacks the mental capacity either to stand trial or to have appreciated the wrongfulness of the alleged criminal conduct, the Government and the court have the right to seek psychiatric counsel rather than rely solely upon the accused's naked assertion. As the lower court correctly noted, "[T]he essential pur-

---

**3.** It should be noted that this Court has not yet had occasion to determine whether the Supreme Court's creation of a privilege for confidential communications between a psychotherapist and a patient under Fed.R.Evid. 501 is applicable to the armed forces. *See Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). Though the language of Mil.R.Evid. 501, Manual for Courts–Martial, United States (1995 ed.), does not expressly preclude adoption of such a privilege, the drafters' analysis accompanying the Rule appears to counsel against it. "Rule 501(d) prevents the application of a doctor-patient privilege. Such a privilege was considered to be totally incompatible with the clear interest of the armed forces in ensuring the health and fitness for duty of personnel. The privilege expressed in Rule 302 and its conforming Manual change in Para.121, is not a doctor-patient privilege and is not affected by Rule 501(d)." Mil. R.Evid. 501, Drafters' Analysis, Manual, *supra* at A22–37 (citation omitted). Regardless, *Jaffee's* applicability to the military is not at issue in this case and need not be decided today.

pose of RCM 706 ... is to detect those individuals who may lack mental responsibility or capacity[,] ... not to provide a privileged communication forum for an accused." 44 MJ at 615.

It should be remembered that the persons performing that review are tasked only with determining whether the accused had a "severe mental disease or defect" at the time of the charged misconduct; if so, whether the accused was at that time "unable to appreciate the nature and quality or wrongfulness" of that conduct; whether the accused has "sufficient mental capacity" to understand the court-martial and to cooperate meaningfully in his defense; and what the "clinical psychiatric diagnosis" would be. RCM 706(c)(2). Since only these conclusions are required by both trial and defense counsel to determine the mental capacity of the accused to stand trial, any statements by the accused, and derivative evidence thereof, are merely incidental to the inquiries. For this reason, though they may be helpful to the Government's case, those extraneous remarks are not made available to trial counsel.

Here, however, appellant sought the counsel of Doctor Hammer and Lt Rogers on his own accord and voluntarily made all statements used by the prosecution during its case-in-chief. The medical records describing the interviews and testing which Hammer and Rogers conducted were available to both trial and defense counsel. In fact, these records formed the basis for both the charge of malingering by feigning mental derangement and the defense motion for a sanity board.

Nothing in the language of RCM 706, Mil. R.Evid. 302, or our precedents, gives defense counsel his choice of doctor(s) for the sanity board or places any proscriptions on who can perform the sanity board—with the exception of the professional qualifications. Both Hammer and Rogers were frequently called upon to perform sanity-board reviews, and, in the practice of this clinic, to perform them alone. Either Doctor Hammer or Lt Rogers easily could have been chosen randomly for assignment of the sanity board.

Due to the unusual nature of the charges preferred against appellant, the same psychiatric evaluations and diagnoses formed the basis of the determination of appellant's mental health, the charges themselves, and appellant's capacity to stand trial. There is no smooth division of the statements which were made to the doctors because the underlying issue of appellant's mental state was relevant to all three determinations. They are intertwined and, absent clear error, we must trust the fact-finder to sort them out for their proper purposes.

In *United States v. Parker*, 15 MJ 146 (1983), this Court was faced with a similar matter of intertwining testimony on mental-health issues, though not specifically relating to a sanity board. We noted that "[c]ivilian courts have attempted to avoid the difficulties in a variety of ways ranging from complete exclusion of any statements of the accused, bifurcated proceedings, sequential proceedings, and limiting instructions from the judge." 15 MJ at 152 (footnotes omitted). We found that there was no prejudicial error in *Parker* because of the procedures followed by the court-martial, including

• that the accused had been read his rights before the evaluation;

• that the Government's evaluation results were available to the defense;

• that the statements elicited in testimony were not "an obvious attempt to put the statements *qua* statements before the members as admissions or a confession";

• that "there was ample evidence" otherwise upon which the accused could have been found guilty beyond a reasonable doubt; and

• that "the military judge twice gave limiting, curative instructions to the members as to the proper usage of the statements."

*Id.* at 152–53. The Court found that final point to be the most significant. *Id.* Here, appellant was before a military judge alone, so no instructions need be verbalized. Art. 51(c) and (d), Uniform Code of Military Justice, 10 USC § 851(c) and (d). Additionally, statements offered as testimony by Doctor Hammer and Lt Rogers were generally not offered for the truth of the matter asserted

and where they were, the judge excluded them as hearsay. Finally, there was ample evidence to support the verdict, even had Doctor Hammer and Lt Rogers only testified as to the four explicit questions of RCM 706.

### III

Assuming, *arguendo,* that the military judge had either granted a new sanity board or excluded Doctor Hammer's and Lt Rogers' testimony on the merits, there would be no different outcome.

Only had appellant made false statements to either Doctor Hammer or Lt Rogers or to some new third person performing a sanity board would there have been a disparity between the information before the various professionals—and, therefore, a disparity in the information available to the opposing counsel—on these various questions. Appellant's sole challenge to the testimony of Hammer and Rogers was that the sanity board had to be separate to protect his confidentiality. Despite ample opportunity to proffer some evidence in support of this allegation, appellant never did so—at trial, at the Court of Criminal Appeals, or before this Court. Interestingly, though the Government presented 14 witnesses with corroborating and convincing evidence against appellant, appellant did not present a defense in his case. He did not even call on the testimony of a defense psychiatric expert witness, despite being encouraged to do so by the military judge and despite the presence at the defense counsel table during the trial of Dr. Sarachene—another doctor who had seen appellant at the time he was seeing Doctor Hammer and Lt Rogers.

Essentially, what we see here are two separate reviews: first by Doctor Hammer and Lt Rogers in treating appellant and then by those same persons in determining his mental capacity pursuant to RCM 706. In the absence of any evidence—in fact, of any allegation—that the evaluations or testimony of the psychiatrist or the psychologist on either review were biased or false or otherwise malicious, there is no reason to have required the perfunctory review of yet another psychiatrist only to satisfy the preferred format of RCM 706.

### APPENDIX

Before FORAY, MICHALSKI and MURDOCK, Appellate Military Judges.

### DECISION

**PER CURIAM:**

A general court martial consisting of members found the appellant guilty, contrary to his pleas, of two specifications of committing indecent acts with females under 16 years old. He now invites our attention to three errors. *United States v. Grostefon,* 12 MJ 431 (CMA 1982). We find them all to be without merit, and affirm.

Appellant contends first that the military judge erred when he denied the defense request for a psychiatric examination of the appellant. In his well drafted essential findings, which we adopt, the trial judge stated that the "thorough screening and observation given the accused on entry and during his participation in the alcohol rehabilitation program was in the standard of *Jancarek* the functional substitute of any evaluation which a sanity board might undertake." The judge stated that he also based his denial on his "own interaction with and observation of the accused in court." *See* RCM 706(a) and (b)(2). He concluded that "[c]onsidering the law, and the facts of record, ordering a sanity board in this case would be frivolous."

The Army Court of Military Review held in *United States v. Jancarek,* 22 MJ 600 (ACMR 1986) that "in a proper case there can be a substitute for a sanity board...." We agree. For the reasons articulated by the trial judge, we hold that the present case is such a case. We are convinced, as was the trial judge, that the functions of a sanity inquiry discussed in RCM 706 were properly fulfilled by the screening and observation of the appellant performed by Dr (Lt Col) Lenora, a board certified child and adult psychiatrist assigned to the Clark Air Base Medical Center. She testified that she had participated in sanity boards in the past. She agreed with the military judge's question

that convening a separate sanity board to consider the appellant's condition would be "just a frivolous act, ... just wasting time." The trial judge did not abuse his discretion in refusing to order the sanity board.

The appellant next asserts a combined issue of sentence appropriateness and ineffectiveness of counsel. Appellate Government counsel has provided a thorough affidavit from the civilian defense counsel which addresses these issues. We are convinced that the appellant was well represented by his civilian defense counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We have conducted an independent review of the appropriateness of the sentence. The approved sentence is entirely appropriate for the offenses of which the appellant was convicted. Article 66(c), UCMJ.

We have examined the record of trial, the assignment of errors, and the government's reply thereto and have concluded that the findings and sentence are correct in law and fact and that no error prejudicial to the substantial rights of the accused was committed. Accordingly, the findings of guilty and sentence are

AFFIRMED.